Slip Op. 07-117

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| MITTAL STEEL USA, INC. (formerly INTERNATIONAL STEEL GROUP, INC.),<br><br>          Plaintiff,<br><br>     v.<br><br>UNITED STATES,<br><br>          Defendant,<br><br>     and<br><br>UNION STEEL MANUFACTURING CO., LTD.; DONGBU STEEL CO., LTD.; POSCO; and HYUNDAI HYSCO CO., LTD.,<br><br>          Deft.-Ints. | Before: Richard K. Eaton, Judge<br><br>Consol. Court No. 05-00308<br>Public Version |

OPINION

[United States Department of Commerce's final results of the tenth administrative review of the antidumping duty order applicable to corrosion-resistant carbon steel flat products from Korea sustained.]

                                        Dated: August 1, 2007

*Stewart and Stewart* (*Wesley K. Caine*, *Caryn B. Schenewerk* and *Sarah V. Stewart*), for plaintiff.

*Peter D. Keisler*, Assistant Attorney General; *Jeanne E. Davidson*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Patricia M. McCarthy*, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Stephen C. Tosini*); Office of the Chief Counsel for Import Administration, United States Department of Commerce (*Ada Loo* and *Irene H. Chen*), of counsel, for defendant.

*Troutman Sanders LLP* (*Donald B. Cameron* and *Brady W. Mills*), for defendant-intervenors Union Steel Manufacturing Co., Ltd. and

Dongbu Steel Co., Ltd.

*Akin, Gump, Strauss, Hauer & Feld, LLP* (*Spencer S. Griffith*, *Warren E. Connelly*, *Jaehong D. Park*, *Jarrod M. Goldfeder*, *Jason A. Park* and *Lisa W. Ross*), for defendant-intervenors POSCO and Hyundai HYSCO Co., Ltd.

Eaton, Judge:  This consolidated action[1] is before the court on plaintiff Mittal Steel USA, Inc.'s ("Mittal") motion for judgment upon the agency record pursuant to USCIT Rule 56.2.  By its motion, plaintiff contests certain aspects of the United States Department of Commerce's ("Commerce" or the "Department") final results of the tenth administrative review of the antidumping duty order applicable to imports into the United States of corrosion-resistant carbon steel flat products ("CORE") from Korea made during the period of review ("POR") August 1, 2002, to July 31, 2003.  *See* Certain CORE from the Republic of Korea, 70 Fed. Reg. 12,443 (Dep't of Commerce Mar. 14, 2005) (tenth admin. rev.) ("Final Results").  In addition, plaintiff contests portions of the Department's conclusions with respect to Hyundai HYSCO Co., Ltd.'s ("HYSCO") new shipper review, which was part of the same determination.  *See* 19 U.S.C. § 1675(a)(2)(B) (2000).  Jurisdiction is had pursuant to 28 U.S.C. § 1581(c)

---

[1]     This action includes court numbers 05-00308 and 05-00309.  *See Mittal Steel USA ISG, Inc. v. United States*, Consol. Ct. No. 05-00308 (Oct. 5, 2005) (order granting plaintiff's consent motion to consolidate cases).  Court number 05-00309 involved plaintiff's challenge to the final results of the new shipper review.

(2000), and 19 U.S.C. § 1516a(a)(2)(B)(iii).  For the reasons set forth below, Commerce's Final Results are sustained.


BACKGROUND

Plaintiff is a domestic producer of CORE products.  On August 19, 1993, Commerce published the antidumping duty order applicable to imports into the United States of CORE from Korea. *See* Certain CORE From Korea, 58 Fed. Reg. 44,159 (Dep't of Commerce Aug. 19, 1993) ("CORE Order").  After having conducted nine prior administrative reviews of the CORE Order, Commerce, on August 1, 2003, published notice that it would consider requests for what would be the tenth review.  *See* Certain CORE from Korea, 68 Fed. Reg. 45,218 (Dep't of Commerce Aug. 1, 2003) (notice).  Thereafter, on August 29, 2003, plaintiff asked Commerce to conduct an administrative review with respect to the behavior and market activities of certain Korean respondents including: POSCO; Dongbu Steel Co., Ltd. ("Dongbu"); and Union Steel Manufacturing Co., Ltd. ("Union").  The tenth administrative review was initiated on September 30, 2003.  *See* Initiation of Antidumping and Countervailing Duty Reviews, 68 Fed. Reg. 56,262, 56,263–64 (Dep't of Commerce Sept. 30, 2003) (notice).  In addition, during the proceeding, HYSCO sought a new shipper review of its sales of CORE to the United States pursuant to 19 U.S.C. § 1675(a)(2)(B), which Commerce initiated on October 3, 2003.  *See* Certain CORE

from Korea, 68 Fed. Reg. 57,423 (Dep't of Commerce Oct. 3, 2003)
(notice).

On March 14, 2005, Commerce published the Final Results of
both the tenth administrative review and HYSCO's new shipper
review.  *See* Final Results, 70 Fed. Reg. at 12,443.  Based on its
analysis, Commerce assigned subject imports from POSCO a 2.34
percent dumping margin; Union and Dongbu received *de minimis*
margins;[2] and HYSCO, as a result of the new shipper review,
received a margin of zero.  *See id.* at 12,445.


## STANDARD OF REVIEW

When reviewing a final antidumping determination the court
"shall hold unlawful any determination, finding, or conclusion
found . . . to be unsupported by substantial evidence on the
record, or otherwise not in accordance with law."  19 U.S.C.
§ 1516a(b)(1)(B)(i).  "Substantial evidence is 'such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion.'"  *Huaiyin Foreign Trade Corp. (30) v. United
States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol.*

---

[2]      Under the statute, Commerce is required to "disregard
any weighted average dumping margin that is de minimis as defined
in section 1673b(b)(3) of this title."  19 U.S.C. § 1673d(a)(4).
"[A] weighted average dumping margin is de minimis if the
administering authority determines that it is less than 2 percent
ad valorem or the equivalent specific rate for the subject
merchandise."  19 U.S.C. § 1673b(b)(3).  Thus, Union and Dongbu
were not required to pay antidumping duties on their entries.

*Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Id.* (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

In addition, "[a]s long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404-05, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137, 1139 (Fed. Cir. 1987).

DISCUSSION

I. Model Match Methodology

Plaintiff's first claim is that the Department unreasonably denied its request that respondents be asked to provide more detailed product data for use in Commerce's model match criteria.[3]  The agency employs these criteria to ensure that the

---

[3]     The criteria include: type; reduction process; metallic coating process; clad material/coating metal; quality; yield strength; metallic coating weight; minimum thickness; width; form; temper rolling; and leveling.  Letter from Stewart and
                                                      (continued...)

merchandise sold in the U.S. market is being compared "with a suitable home-market product" for purposes of calculating antidumping duties.  *Koyo Seiko Co. v. United States*, 66 F.3d 1204, 1209 (Fed. Cir. 1995); *see also* 19 U.S.C. § 1677(16)(C)(iii).

Commerce maintains that, in accordance with its practice, it chose the model match criteria during the initial sales at less than fair value investigation and has used them in each review since in order to provide a "consistent methodology from review to review" upon which respondents could rely.  Def.'s Resp. Pl.'s Mot. J. Agency R. ("Def.'s Resp.") 9; *see also* Certain CORE From Korea, 58 Fed. Reg. 37,176 (Dep't of Commerce July 9, 1993).

It is plaintiff's position that, had respondents been asked for more specific product data, it would have been able to conduct a more detailed analysis and possibly uncover a compelling reason for changing the criteria, thus enabling Commerce to produce more accurate results.  *See* Pl.'s Mem. Supp. Mot. J. Agency R. ("Pl.'s Mem.") 12 ("Commerce refused even to request that respondents submit the more precise data.  This precluded Mittal from analyzing detailed sales information that might have substantiated Mittal's fair concerns . . . .")

---

[3](...continued)
Stewart, Wesley K. Caine, to Commerce (May 28, 2004) Ex. A, at A-2.

(emphasis omitted).[4]

For Commerce, the need for consistency in the model match criteria stems from its duty to calculate antidumping rates as accurately as possible. *See, e.g.*, *Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1446 (Fed. Cir. 1994). Because consistency is, according to Commerce, linked inextricably to accuracy, the Department maintains that it changes its model match criteria only if a participant can demonstrate a

_____

[4]    For instance, plaintiff states:

Commerce defined "widths" by reference to the following four measurement groups: (a) >= ½" but <24"; (b) >=24" but <40"; (c) >=40" but <60"; and (d) >=60". Similarly, it defined "thickness" by reference to these 11 separate groups: (a) <0.014"; (b) >=0.014" but <0.015"; (c) >=0.015" but <0.016; (d) >=0.016" but <0.018"; (e) >=0.018" but <0.022"; (f) >=0.022" but <0.028"; (g) >=0.028" but <0.044"; (h) >=0.044" but <0.060"; (i) >=0.060" but <0.085"; (j) >=0.085" but <0.130"; and (k) >=0.130". Thus, to identify goods for price comparisons, Commerce would treat as "identical" articles all CORE within a given range, so far as the particular criterion was concerned. Put differently, articles with different physical dimensions could still be treated as "identical," and Commerce could directly compare their prices in antidumping margin calculations.

Pl.'s Mem. 6.   In Mittal's view, requiring respondents to provide product data on a narrower range of dimensions might have provided a compelling reason to change the criteria. That is, more specific data could, according to plaintiff, have demonstrated a substantial difference between the subject merchandise and the purportedly comparable foreign like product.

"compelling reason" for the modification.  Def.'s Resp. 9; *see also* Mem. from Eric B. Greynolds, Program Manager, Office of AD/CVD Enforcement VI, to Melissa G. Skinner, Dir., Office of AD/CVD Enforcement VI (Aug. 27, 2004) ("Model Match Mem.") at 5 (citing Steel Wire Rope From Malaysia, 66 Fed. Reg. 12,759 (Dep't of Commerce Feb. 28, 2001); Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof From France; et al., 57 Fed. Reg. 28,360, 28,366 (Dep't of Commerce June 24, 1992); Tapered Roller Bearings, Finished and Unfinished, and Parts Thereof, From Japan, 56 Fed. Reg. 41,508, 41,509 (Dep't of Commerce Aug. 21, 1991)).

Plaintiff first introduced its concerns in a letter from its counsel to Commerce.  *See* Letter from Stewart and Stewart, Wesley K. Caine, to Commerce (May 28, 2004) ("May 28 Letter").  By this letter, plaintiff sought to demonstrate the necessity of demanding more specific data by claiming that the product ranges in Commerce's questionnaire, for thickness, width, type and quality did not correspond with the actual data contained in Union's, Dongbu's and POSCO's pricing sheets.  *See* May 28 Letter at 2.  To bolster its position that Commerce should have asked respondents for additional product and pricing information, plaintiff compared merchandise within Commerce's ranges to the

prices charged.[5]  Mittal concluded that Commerce's ranges produced a variance in prices sufficient to warrant the agency's issuance of a supplemental questionnaire.  *See* Pl.'s Mem. 27 ("This should have prompted the agency to at least request more precise data, which would have allowed it and Mittal to pursue the matching issues more deeply via computer analysis.  However, the agency refused to request the information, much less perform analyses, which left valid issues un-addressed.") (emphasis omitted); *see also* Pl.'s Mem. 27 (citing *Freeport Minerals Co. v. United States*, 776 F.2d 1029, 1033 (Fed. Cir. 1985)).  Before the court, plaintiff continues to press this claim insisting,

---

[5]      Specifically, plaintiff [[

                                                        ]]  Pl.'s
Mem. 8.  For instance, with respect to thickness, plaintiff
contends that it examined

        [[




                                        ]]

Pl.'s Mem. 8 (emphasis omitted).  Plaintiff contends that it
found similar results after analyzing [[
        ]].  *See* Pl.'s Mem. 8-10.

however, that it is not "asking the Court at this point to rule categorically that Commerce's methodology completely fails as a matter of law."  Pl.'s Mem. 27 n.13.

According to Commerce, it found the issuance of a supplemental questionnaire was not required because plaintiff's May 28 Letter, and the various price analyses contained therein, failed to establish its necessity.  As Commerce stated in its Model Match Memorandum:

> Regarding the price lists cited by [plaintiff] in [its] submission, we find there is no evidence indicating that the price lists reflect actual transaction prices, and, thus, we find that they do not necessarily reflect the Korean respondents' actual sales and pricing practices.  In addition, several of the price lists cited by [plaintiff] are exclusive to the Korean respondents' home market and, thus, offer no information on how the products are sold in the U.S. market.  Therefore, we find that the internal pricing guidelines cited by [plaintiff]: (1) fail to indicate a change in the Korean respondents' production/pricing practices and (2) do not necessarily reflect the norms of the Korean respondents.

Model Match Mem. at 5-6.

Commerce further argues that plaintiff "overstates the case that narrower bands for model matches will necessarily create more accurate results."  Def.'s Resp. 14.  The Department insists that "the more bands that are applied, the fewer actual sale to sale matches there will be -- requiring Commerce to resort to constructed value for additional United States sales."  Def.'s

Resp. 14.

As has been noted, plaintiff does not demand a change in the Department's methodology.  Mittal's sole claim is that Commerce should have sought more information from the respondents.  The stated purpose of plaintiff's request is to uncover additional information that it hopes will provide a basis for a challenge to Commerce's model match criteria.  Therefore, the court is asked to determine whether Commerce supported with substantial evidence its decision not to issue a supplemental questionnaire seeking additional model match data.  The court finds that Commerce has justified its decision.

First, as noted by Commerce, the price lists plaintiff references are just what they appear to be — price lists.  This being the case, Commerce was justified in finding that they did not necessarily reflect actual sales.  Commerce, on the other hand, had obtained actual sales data from the questionnaire responses upon which it reasonably relied.  Also, Commerce observed that some of plaintiff's evidence of respondents' pricing practices related solely to home market sales, which shed no light on the price of CORE sold by respondents in the United States.  Moreover, Commerce was not unreasonable in finding that plaintiff's demand to narrow the range of dimensions compared would create more inaccuracies in dumping calculations because fewer actual sales would be available for direct comparison.

Thus, because plaintiff has not made out a sufficient case for the issuance of a supplemental questionnaire and because the Department had in its possession all of the information needed to make a fair and reasonable product comparison, the court sustains Commerce's decision not to seek additional product and sales data.

II.  Constructed Export Price: Deduction of Selling Expenses

     A.   Location of Incurred Costs

Plaintiff next insists that Commerce unlawfully failed to deduct from constructed export price ("CEP")[6] certain "core

_____

     [6]    Constructed export price ("CEP") is

          the price at which the subject merchandise is
          first sold (or agreed to be sold) in the
          United States before or after the date of
          importation by or for the account of the
          producer or exporter of such merchandise or
          by a seller affiliated with the producer or
          exporter, to a purchaser not affiliated with
          the producer or exporter, as adjusted under
          subsections (c) and (d) of this section.

19 U.S.C. § 1677a(b).  CEP, or U.S. price, is then compared to
normal value to calculate the dumping margin.  Normal value is
defined as

          the price at which the foreign like product
          is first sold (or, in the absence of a sale,
          offered for sale) for consumption in the
          exporting country, in the usual commercial
          quantities and in the ordinary course of
          trade and, to the extent practicable, at the
          same level of trade as the export or
          constructed export price . . . .

                                        (continued...)

selling expenses[7] associated with resale transactions of subject

merchandise in the United States . . . merely because [the

expenses] involved activities that occurred 'outside' the United

States."  Pl.'s Mem. 33.  More specifically, plaintiff asserts

that Commerce committed legal error by its unwillingness to make

a downward adjustment to CEP equal to the claimed selling

expenses incurred by the Korean parents in facilitating the

resales of CORE to unaffiliated U.S. customers.[8]  *See* Pl.'s Mem.

12-13.  For plaintiff, under 19 U.S.C. § 1677a(d),[9] if "the

---

[6](...continued)
19 U.S.C. § 1677b(a)(1)(B)(i).

[7]     Plaintiff's reference to "core" selling functions is
apparently intended to describe such activities as negotiating
price, entering into sales contracts and approving resales;
however, neither the statute nor the regulations define the
phrase.  *See* Pl.'s Mem. 39 (suggesting that Commerce define
"core" functions, if necessary).

[8]     The Korean parent companies are respondents: Union,
Dongbu, POSCO and HYSCO.

[9]     Subsection 1677a(d) provides, in pertinent part:

     [T]he price used to establish [CEP] shall
     also be reduced by——

          (1) the amount of any of the
          following expenses generally
          incurred by or for the account of
          the producer or exporter, or the
          affiliated seller in the United
          States, in selling the subject
          merchandise (or subject merchandise
          to which value has been added)——

               (A) commissions for
                                                  (continued...)

activities and associated expenses relate to the resales in the United States," the deduction must be made regardless of when and where the expenses were incurred.  Pl.'s Mem. 12.

With respect to plaintiff's legal contention, Commerce does not disagree.  That is, the Department maintains that it makes justified CEP deductions no matter where expenses are incurred or paid.  *See* Def.'s Resp. 16 (noting that Commerce deducts from CEP selling expenses that "relate directly to the sale to an unaffiliated purchaser, even if, for example, the foreign parent of the affiliated U.S. importer pays those expenses") (internal quotation marks & citation omitted).  Rather, Commerce urges that its decision here not to deduct certain costs from CEP was

---

[9](...continued)

selling the subject merchandise in the United States;

(B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;

(C) any selling expenses that the seller pays on behalf of the purchaser; and

(D) any selling expenses not deducted under subparagraph (A), (B), or (C) . . . .

19 U.S.C. § 1677a(d)(1).

appropriate because the amounts expended by respondents related to sales to affiliated U.S. importers and not to unaffiliated U.S. customers.  *See* Def.'s Resp. 14; *see also* 19 C.F.R. § 351.402(b) (2005);[10] Issues & Decisions for the Final Results of the Antidumping Duty New Shipper Review and the Antidumping Duty Administrative Review of Certain CORE from Korea (Dep't of Commerce Mar. 7, 2005) ("Issues & Decs. Mem.") at 10.

Moreover, at no point does Commerce state that it did not deduct the expenses because they were incurred in Korea.  Rather, it is apparent that Commerce's justification for its decision to not deduct from respondents' CEP certain expenses is its conclusion that selling expenses can only be deducted from CEP when they are incurred in connection with the sale of merchandise to an unaffiliated U.S. customer.  Thus, plaintiff's legal argument that Commerce acted unlawfully by refusing to deduct

---

[10]     The regulation provides:

> In establishing [CEP] under section 772(d) of the Act, the Secretary will make adjustments for expenses associated with commercial activities in the United States that relate to the sale to an unaffiliated purchaser, no matter where or when paid.  The Secretary will not make an adjustment for any expense that is related solely to the sale to an affiliated importer in the United States, although the Secretary may make an adjustment to normal value for such expenses under section 773(a)(6)(C)(iii) of the Act.

19 C.F.R. § 351.402(b).

from CEP selling expenses incurred by respondents simply because those expenses were from activities taking place outside the United States is without merit.

B.    Costs Related to Resales of CORE to Unaffiliated U.S. Purchasers

Plaintiff also raises the factual argument that respondents did, in fact, incur core selling expenses "associated with commercial activities in the United States that relate to the sale to an unaffiliated purchaser . . . ."  19 C.F.R. § 351.402(b).  Commerce's failure to deduct those expenses from CEP was, in Mittal's view, unsupported by substantial evidence.

To buttress its point, plaintiff sets forth what it believes were the selling functions performed by each respondent in the resale of its merchandise in the United States.  For instance, with respect to Union's relationship with its affiliate DKA, plaintiff states:

> Union sold CORE to DKA, its U.S. affiliate, who in turn resold the merchandise to unrelated U.S. buyers in reportable CEP transactions.  The record shows that Union, the parent, performed many selling functions in the affiliate's U.S. *re-sales*.  In fact, describing the affiliate's limited role, Union reported that DKA was the importer of record for all of Union's U.S. sales and acted as a communications liaison between U.S. customers and Union and as a processor of sales-related documentation.  Thus, while DKA receives inquiries from customers and may propose a price for the purchase, it does not have the authority to accept or reject the order.  In fact, DKA does not even take possession of the imported goods; rather,

Union ships the goods directly to DKA's U.S. customer.

Pl.'s Mem. 13 (internal quotation marks & citations omitted) (emphasis in original).  In addition, plaintiff states that Union engaged in other activities aimed at selling CORE to unrelated U.S. customers including handling claims for defective CORE sold in the U.S. and sending company engineers directly to a customer's plant in order to assist that customer with streamlining its facility.  *See* Pl.'s Mem. 13.[11]  Thus, it is plaintiff's contention that the costs absorbed by Union in the resale of CORE to an unaffiliated U.S. customer should have been deducted from CEP.

Plaintiff makes similar claims with regard to POSCO, Dongbu and HYSCO.  Based on its construction of the facts, plaintiff maintains that the record reveals a substantial level of involvement by the respondents in the resale of CORE to unaffiliated U.S. purchasers.  That is, Mittal insists that the respondents incurred selling expenses related to the resale of CORE to unaffiliated buyers in the United States and, thus, in accordance with 19 U.S.C. § 1677a(d)(1) and 19 C.F.R. § 351.402(b), Commerce is required to deduct the costs from CEP. *See* Pl.'s Mem. 33, 37–38.

---

[11]     Moreover, plaintiff suggests that Union [[

]]  Pl.'s Mem. 13.

Despite plaintiff's contentions, the court finds that Commerce supported with substantial evidence its decision to refrain from deducting the selling expenses identified by plaintiff as being associated with the resale of CORE to unaffiliated purchasers in the United States.  Commerce must deduct from the starting price only those expenses that are "associated with commercial activities in the United States that relate to the sale to an unaffiliated purchaser . . . ."  19 C.F.R. § 351.402(b).  Commerce, however, "will not make an adjustment [to CEP] for any expense that is related solely to the sale to an affiliated importer in the United States . . . ."  *Id.*

Here, "Commerce requested and received from respondents information regarding all business or operational relationships affecting the development, product, sale or distribution of the subject merchandise," verified that information, and found that respondents' expenses did not relate to sales to unaffiliated U.S. buyers.  Def.'s Resp. 16.  For example, verification of Dongbu's questionnaire responses revealed:

> [S]ales negotiations begin with Dongbu USA [Dongbu's United States affiliate] and the U.S. customer.  Dongbu USA informs Dongbu of the sales order, then Dongbu inputs the sales order into Dongbu's sales system, at which time the merchandise is produced to order. Company officials stated that Dongbu ships directly to the port of the customer's request, which is stated in the sales contract between Dongbu USA and customer. Company officials added that the shipment arrangements are made by Dongbu according to

> the terms that are negotiated between the customer and Dongbu USA. . . .  Company officials also stated that Dongbu USA clears the merchandise through Customs and arranges for the payments of the customs broker and customs duties. . . .  Company officials stated that Dongbu USA generally issues the invoice to the customer after it has been shipped, but before it arrives to the United States. . . .  They stated that the customer pays Dongbu USA . . . .

Dongbu Verification Mem. (Dep't of Commerce Feb. 1, 2005) at 29; *see also id.* at 30 ("We reviewed the list of selling activities performed by Dongbu and Dongbu USA for each market, and distribution channel.  We also reviewed the list of selling activities and confirmed with company officials the level of activity in each market . . . .  We noted no discrepancies."). The Department understood this evidence to indicate that Dongbu's U.S. affiliate, not Dongbu, incurred the selling expenses resulting from U.S. resales of CORE.  Because "[t]here is no evidence on the record to suggest [Dongbu's] reported . . . selling expenses are directly attributable to U.S. sales," Commerce concluded that these expenses were not deductible from CEP.  Issues & Decs. Mem. at 10.

Commerce made similar findings with respect to the level of involvement in resales of CORE to unaffiliated U.S. purchasers upon verifying Union's, POSCO's and HYSCO's responses and likewise found the reported incurred expenses to be unrelated to those sales.  *See* Union Verification Mem. (Dep't of Commerce Feb.

1, 2005) at 20; Sales Verification Rep. for POSCO (Dep't of Commerce Feb. 1, 2005) at 26; Verification of Sales and Cost Information Submitted by HYSCO (Dep't of Commerce Feb. 1, 2005) at 9.

As discussed above, plaintiff interprets the record evidence to indicate a higher level of involvement by the respondents in the resale of CORE than that found by the Department.  Commerce, however, considered the verification data and determined that there was "no evidence on the record to suggest respondents' reported . . . selling expenses [were] directly attributable to U.S. sales."  Issues & Decs. Mem. at 10.  In fact, after verifying respondents' questionnaire responses, the Department found that the expenses respondents incurred in selling CORE to their affiliates in the United States were general and not related to resales of CORE to unaffiliated buyers.  *See id.*

An examination of Commerce's analysis and of the evidence submitted by plaintiff confirms that Commerce was justified in its findings.  That is, plaintiff has not made a case that the selling functions performed by the parent companies were mischaracterized by Commerce.  In addition, Commerce has adequately explained its conclusions.  Thus, despite plaintiff's claim to the contrary, the court finds that the Department "articulate[d] a[] rational connection between the facts found and the choice made."  *Burlington Truck Lines, Inc. v. United*

*States*, 371 U.S. 156, 168 (1962).

Based on the foregoing, the court sustains as supported by substantial evidence Commerce's refusal to deduct selling expenses from CEP because the Department reasonably concluded that respondents' reported expenses were not directly associated with resales of CORE to unaffiliated purchasers in the United States.

III. Dongbu and POSCO CEP Offset Adjustments

Next, plaintiff takes issue with Commerce's grant of a CEP offset to normal value to both POSCO and Dongbu to adjust for their home-market sales having been made at a more advanced stage of distribution than their sales in the United States.[12]  *See* 19 U.S.C. § 1677b(a)(7)(B).  Specifically, plaintiff asserts that "Commerce acted unreasonably when it allowed the . . . 'CEP offsets' to respondents who failed to provide full descriptions of all selling activities at the CEP [level of trade]."  Pl.'s Mem. 24.  For these purposes, CEP sales involve the resale of

---

[12]     The Federal Circuit has stated that "the level of trade adjustment is designed to ensure that the normal value and U.S. price are being compared . . . at the same level of trade, that is, at the same marketing stage in the chain of distribution that begins with the manufacturer."  *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1314 (Fed. Cir. 2001).  Indeed, an adjustment to normal value is necessary because "[e]ach more remote level of trade must be characterized by an additional layer of selling activities, amounting in the aggregate to a substantially different selling function."  *Id.* (internal quotation marks, alteration & citation omitted).

goods from the U.S. affiliate to an unaffiliated U.S. buyer. Because it is often the case that the U.S. affiliate will absorb the majority of the selling expenses and perform most, if not all of the selling functions in the resale to an unaffiliated buyer, Commerce looks to the "sale *to* the affiliate, not the affiliate's resale transaction" for purposes of determining the CEP level of trade ("LOT").  Pl.'s Mem. 18 (emphasis in original); *see also* Certain Hot-Rolled Carbon Steel Flat Products from Romania, 70 Fed. Reg. 72,984, 72,987 (Dep't of Commerce Dec. 8, 2005) (prelim. results) (stating that "[f]or CEP sales, the U.S. level of trade is the level of the constructed sale from the exporter to the affiliated importer").[13]  Because neither Dongbu nor POSCO

---

[13]    While CEP is statutorily defined as "the price at which the subject merchandise is first sold . . . in the United States before or after the date of importation by . . . a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter," 19 U.S.C. § 1677a(b), for purposes of comparing the level of trade for CEP sales, Commerce examines the selling functions performed by the foreign producer or exporter in selling the merchandise to its U.S. affiliate.  *See* Preamble to Final Rule, 62 Fed. Reg. 27,296, 27,370 (Dep't of Commerce May 19, 1997) ("[T]he Department will base the LOT of CEP on the U.S. affiliate's starting price in the United States . . . .").
    In an unrelated investigation, Commerce explained its procedure for determining the CEP LOT:

> First, the indirect selling expenses incurred
> in the United States by [U.S. affiliate]
> CIC's sales departments are, pursuant to [19
> U.S.C. § 1677a(d)(1)(D)], properly excluded
> from the price calculated for the U.S. CEP
> sales.  Pursuant to this and other . . .
> adjustments, [the U.S. affiliate]'s price to

(continued...)

reported any selling expenses incurred for sales to their U.S. affiliates, plaintiff insists that the record does not support Commerce's grant of a CEP offset.

Commerce is required by statute to make an LOT adjustment to normal value to account for the price differential resulting from a respondent's sales in the home market being made at a more advanced LOT than its sales to the United States.[14]  *See* 19 U.S.C. § 1677b(a)(7)(A).  The statute further provides that the Department only makes an LOT adjustment to normal value if "the difference in [LOT] . . . is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different [LOTs] in the country in which normal value is determined."  19 U.S.C. § 1677b(a)(7)(A)(ii).

---

[13](...continued)
> its unaffiliated customer (the "starting price") is transformed into a constructed export price, i.e., a constructed equivalent of a market-based sale by [foreign producers/exporters] Cinsa or ENASA to CIC [the U.S. affiliate].  This is the point at which the level of trade comparison is made.

Porcelain-on-Steel Cookware From Mexico, 63 Fed. Reg. 38,373, 38,378 (Dep't of Commerce July 16, 1998) (final results).

[14]     The Federal Circuit has noted that "[n]either the statute nor the accompanying Statement of Administrative Action . . . defines the phrase 'same level of trade.'"  *Micron Tech.*, 243 F.3d at 1305 (citation omitted).  Nonetheless, the Court has interpreted the term "to mean comparable marketing stages in the home and United States markets, e.g., a comparison of wholesale sales in Korea to wholesale sales in the United States."  *Id.*

Where the record contains insufficient data to make an LOT adjustment, a CEP offset to normal value may be granted.[15]

> When normal value is established at a[n] [LOT] which constitutes a more advanced stage of distribution than the [LOT] of the [CEP], but the data available do not provide an appropriate basis to determine under subparagraph (A)(ii) a[n] [LOT] adjustment, normal value shall be reduced by the amount of indirect selling expenses incurred in the country in which normal value is determined on sales of the foreign like product . . . .

19 U.S.C. § 1677b(a)(7)(B). Unlike an LOT adjustment, then, the CEP offset does not demand evidence of an effect on price comparability. Indeed, the CEP offset can only be used in the absence of such evidence. *See* 19 C.F.R. § 351.412(f)(3) ("Where available data permit the Secretary to determine under paragraph (d) of this section whether the difference in [LOT] affects price

---

[15]     Congress anticipated the situation where the record would support a finding that sales were made at different levels of trade but would fall short of establishing that the difference had a measurable effect on price comparability and thus created the CEP offset adjustment. *See* Statement of Administrative Action, Uruguay Round Agreements Act, accompanying H.R. Rep. No. 103-316, 656, 830–31 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4169 ("SAA").

> The constructed export price offset adjustment will only be made where normal value is established at a level of trade more remote from the factory than the level of trade of the constructed export price; i.e., where the [LOT] adjustment . . . if it could have been quantified, would likely have resulted in a reduction of the normal value.

*Id.* at 831, 1994 U.S.C.C.A.N. at 4169.

comparability, the Secretary will not grant a [CEP] offset.  In

such cases, . . . the Secretary will make a[n] [LOT]

adjustment.").

Finding sales to be at a more advanced stage of distribution

can be shown by evidence that the foreign producer or exporter

performs more selling activities, and thus incurs more selling

expenses, in its home market than it does in the United States.

*See Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1305

(Fed. Cir. 2001) ("The effect [of the CEP offset] is to reduce

the price of the more advanced level of trade by 'indirect

selling expenses' that have been included in the price on the

apparent theory that such costs would not have been incurred if

the sale had been made on a less advanced [LOT].").

Here, Commerce allowed both Dongbu and POSCO a CEP offset.

In reaching its decision to grant the offset, Commerce examined

the data submitted by each respondent for its home-market and

United States sales.

After comparing Dongbu's selling functions in the home

market to its selling functions in the United States, the

Department "found a less advanced level of trade in the U.S.

market."  Calculation Mem. for Dongbu (Dep't of Commerce Aug. 30,

2004) ("Dongbu Offset Mem.") at 2.  For that reason, Commerce

found warranted the grant of a CEP offset in order to "match[]

the U.S. CEP sales to sales at the same level of trade in the

home market."  *Id.*

The Department also reviewed POSCO's reported home-market selling activities and

> granted a CEP offset because we found that the home market sales[16] were at a different stage of distribution compared to sales to the U.S. [stage of distribution] with respect to the [home market] [stage of distribution]. Because the [stage of distribution] of the U.S. sales is different than the home market [stage of distribution] and there is no home market [stage of distribution] comparable to that of the CEP sales, there is no reliable basis for quantifying a[n] LOT adjustment . . . .  Therefore, a CEP offset was applied to [normal value] for the [normal value]-CEP comparisons.

*Id.* at 10.

Plaintiff's principal claim is that Commerce lacked evidence sufficient to justify a CEP offset.  *See* Pl.'s Mem. 39-40. Mittal argues that "[i]n its initial questionnaire Commerce instructed all respondents to identify all selling activities relevant to claims for any LOT adjustments, *ergo* CEP offsets. . . .  Both POSCO and Dongbu responded to Commerce's questionnaire.  They did not, however, provide information regarding selling activities in sales at the CEP LOT."  Pl.'s Mem. 40.  In other words, plaintiff maintains that the absence of information regarding respondents' selling expenses incurred in

---

[16]     Commerce calculated net home market price using a formula set forth in the POSCO Offset Memorandum.  The formula appears to have taken into account various expenses including packing, credit and rebates.  POSCO Offset Mem. at 5-6.

making CORE sales to their U.S. affiliates should have prompted Commerce to ask respondents for that data before granting the respondents a CEP offset.

Plaintiff further argues that this absence of information does not mean that there were no such expenses and that the inclusion of these expenses would likely indicate that the home-market LOT was not more advanced than that at the CEP level. *See* Pl.'s Mem. 43. For plaintiff,

> both POSCO and Dongbu actively assist their U.S. affiliates in reselling merchandise in the United States. Since those resales are *affiliates'* sales, it is fair to conclude that the Korean parents perform the activities to promote *their own* sales to the affiliates at the CEP LOT. Therefore, Commerce should have weighed the activities in the analysis of offset claims.

Pl.'s Mem. 42 (emphasis in original); *see also* Pl.'s Mem. 42–43.

Despite plaintiff's arguments, the court finds Commerce's grant of a CEP offset to POSCO and Dongbu supported by substantial evidence and in accordance with law. In particular, the court concludes that the Department, while not having sufficient evidence to make an LOT adjustment, reasonably relied on evidence of the selling functions performed by POSCO's and Dongbu's U.S. affiliates in deciding to grant the companies a CEP offset.

In making its determination, the Department "review[ed] the distribution system in each market (i.e., the 'chain of

distribution') [for both Dongbu and POSCO] including selling functions, class of customer ("customer category") and level of selling expenses for each type of sale."  Issues & Decs. Mem. at 11.

With respect to Dongbu, Commerce's analysis of that company's verified questionnaire responses revealed that in its home market, "Dongbu sold [CORE] through two channels of distribution to two customer categories, and claimed one level of trade in the home market."  Dongbu Offset Mem. at 2.  Commerce determined that, although Dongbu reported selling CORE in Korea through two channels of distribution, "the two home market channels of distribution . . . constitute one of level of trade." *Id.*  Plaintiff does not dispute this finding.

Commerce also analyzed Dongbu's sales to the United States for purposes of determining whether an offset was necessary.  Of importance here are two findings.  First, as plaintiff acknowledges, Dongbu completed Commerce's questionnaire asking that it "list . . . all the selling and activities performed and services offered in the U.S. market and the foreign market." Pl.'s Mem. 40.  Plaintiff claims that Dongbu's answers were deficient even though Commerce verified the answers.  *See* Pl.'s Mem. 40; Def.'s Resp. 21.  That is, plaintiff insists that Dongbu must have had more selling expenses with respect to its sales at the CEP LOT, i.e., sales to its U.S. affiliate, Dongbu USA, than

it reported.  Commerce, though, in verifying Dongbu's responses, found only that "Dongbu's activities for U.S. sales are limited to foreign movement expenses."  Dongbu & Union Br. Opp'n Pl.'s R. 56.2 Mot. J. Agency R. 40 (quoting Dongbu's Section A Resp. at 18).  Thus, while plaintiff may insist that there were other unlisted expenses, the verified evidence on the record indicates otherwise.

Commerce further found that "Dongbu made only CEP sales through its U.S. affiliate, Dongbu USA, to unaffiliated customers in two customer categories, end-users and distributors, and had only one level of trade for U.S. sales."  Dongbu Offset Mem. at 2.  Noting that Dongbu USA "perform[ed] most of the selling functions in the United States," Commerce concluded that Dongbu's sales in the United States were at a less advanced stage of distribution than its sales in its home market of Korea, and granted Dongbu the CEP offset.  *See id.*

After performing the same analysis for POSCO, Commerce found that the company sold CORE in Korea to three different types of customer categories through three channels of distribution.  *See* POSCO Offset Mem. at 9.  Commerce concluded that because the selling activities undertaken in each of the three channels of distribution "differed only slightly, . . . the home market channels of distribution constituted one level of trade."  *Id.* at 10.

Commerce also "examined the sales to [POSCO's] affiliated resellers and examined the selling functions performed by POSCO . . . on behalf of its affiliate and found only one level of trade." *Id.* The Department found that, "[i]n the U.S. market, [POSCO] made only CEP sales of subject merchandise," through only one channel of distribution. *Id.* Further, sales were made by POSCO's affiliate to unaffiliated U.S. trading companies. *Id.* Plaintiff does not dispute these findings.

POSCO, too, submitted timely and complete responses to Commerce's questionnaire and the Department subsequently verified the answers. *See* POSCO & HYSCO Opp'n Pl.'s R. 56.2 Mot. J. Agency R. ("POSCO & HYSCO Br.") 28. POSCO's questionnaire responses showed that the company performed a substantial number of selling activities when selling CORE in Korea, but did not perform these activities when selling CORE in the United States. *See* POSCO & HYSCO Br. 28 (listing home-market selling activities including, but not limited to "sales and marketing; freight and delivery arrangement; market research; quality control; computer, legal, and accounting assistance and business-systems development assistance; . . . [and] sales force development and end user contact and support"). Based on this verified information, Commerce found that "the home market sales were at a different stage of distribution compared to sales to the U.S. LOT." POSCO Offset Mem. at 10.

As has been noted by defendant, plaintiff's objections do not amount to much more than speculation.  Indeed, plaintiff's contention that Commerce unreasonably granted a CEP offset because "a reasonable mind would recognize, as a matter of common commercial sense, that affiliates engage in numerous inter-company activities when performing complementary and overlapping roles in marketing goods internationally," finds no evidentiary support.  Pl.'s Mem. 42-43.  Commerce issued Dongbu and POSCO questionnaires, the respondents provided timely and complete answers, the Department then verified those responses and found no discrepancies.  As a result, Commerce determined that the hypothetical costs Mittal insisted had to exist simply did not.

Further, plaintiff's related claim that Commerce lacked sufficient evidence to grant the CEP offset because of Dongbu's and POSCO's incomplete submissions is directly contradicted by Commerce's verification of the companies' questionnaire responses, which revealed no inconsistencies and which provided sufficient evidence with respect to selling activities in both the home and U.S. markets.  The court cannot, therefore, credit plaintiff's unsubstantiated assertion that commercial realities render insufficient the evidence Commerce relied upon in making its decision to grant Dongbu and POSCO a CEP offset.

Thus, the court sustains as supported by substantial evidence and in accordance with law the Department's grant of a

CEP offset to both POSCO and Dongbu.


IV.  Duty Drawback Adjustment

Plaintiff further contends that Commerce should not have allowed for a duty drawback adjustment to CEP because it claims the Korean drawback system is susceptible to manipulation.[17]  As part of this claim, plaintiff maintains that Commerce's current standard for making drawback adjustments amplifies the potential for distorted dumping margins on Korean products, in part, because a Korean exporter is not required to allocate its total rebates over all of its shipments.  Mittal's specific complaint is that the Department acted unlawfully by refusing to ask respondents for further data thus "allowing for fair and appropriate allocations" of the rebate received to the total lot of respondents' shipments of CORE.  Pl.'s Mem. 45 (emphasis omitted).

The antidumping statute provides that "[t]he price used to establish . . . [CEP] shall be . . . increased by . . . the

_____

[17]    Generally, a "drawback" is "[a] government allowance or refund on import duties when the importer reexports imported products rather than selling them domestically."  Black's Law Dictionary 532 (8th ed. 2004); *see also E.I. du Pont Nemours & Co. v. United States*, 24 CIT 1045, 1046 n.2, 116 F. Supp. 2d 1343, 1345 n.2 (2000) ("[D]uty drawback" generally, is the refund of duties paid on goods imported into the United States when those goods, or domestic goods of the same kind and quality, are used in the manufacture or production of articles which are subsequently exported.").

amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States . . . ."  19 U.S.C. § 1677a(c)(1)(B).  Based on the statute, Commerce has created a two-prong test that must be satisfied prior to the grant of a drawback adjustment.  The first prong requires the exporter to establish that "the import duty and rebate are directly linked to, and dependent upon, one another."  *Far East Mach. Co. v. United States*, 12 CIT 972, 974, 699 F. Supp. 309, 311 (1988) (internal quotation marks & citation omitted).  The second prong demands that "the company claiming the adjustment [must] demonstrate that there were sufficient imports of imported raw materials to account for the duty drawback received on the exports of the manufactured product."  *Id.*, 699 F. Supp. at 311; *see also* Issues & Decs. Mem. at 13.  For over twenty years, Commerce has consistently applied, and this Court has consistently upheld, this test.  *See, e.g.*, *Carlisle Tire & Rubber Co. v. United States*, 11 CIT 168, 171, 657 F. Supp. 1287, 1290 (1987); *Far East Mach. Co. v. United States*, 12 CIT 428, 431–33, 688 F. Supp. 610, 612 (1988) (citation omitted); *Hornos Electricos de Venezuela, S.A. v. United States*, 27 CIT 1522, 1525, 285 F. Supp. 2d 1353, 1358 (2003); *Wheatland Tube Co. v. United States*, 30 CIT __, __, 414 F. Supp. 2d 1271, 1286–87 (2006).

Here, following verification, Commerce found that the respondents had satisfied the two-prong test.  *See* Issues & Decs. Mem. at 13.  Mittal does not fault this finding.  Rather, plaintiff questions the utility of the test as applied to exports from Korea.  According to plaintiff, "Korea's duty drawback law effectively allows exporters to choose the export shipments on which they base drawback claims on exportations," which in turn permits an exporter to manipulate its dumping margin.  Pl.'s Mem. 24.  That is, for plaintiff, if an exporter is allowed to apply its drawback claims solely to shipments intended for the United States, CEP increases artificially and the dumping margin decreases.  Plaintiff insists that this potential for distorted results should have induced the Department to ask respondents for additional specific information relating to their drawback claims, which, in turn, Commerce could have used "to determine whether drawback claims were in fact disproportionate and excessive."  Pl.'s Mem. 46.

In essence, Mittal seeks the addition of a third prong to Commerce's current two-prong test.  That is, Mittal believes that the opportunity for margin manipulation would diminish if an exporter were required to demonstrate that it had allocated its rebates across all of its shipments. Plaintiff observes that, as in the United States, the Korean drawback scheme does not require such an allocation and thus opens the door for inaccurate dumping

calculations.  In Mittal's view:

> Although unquestionably lawful in Korea, the
> Korean system makes it possible to manipulate
> U.S. antidumping results. . . .  We can
> assume that Korean "Producer X" produces only
> one product, CORE, and that it uses steel
> scrap as the basic input.  We can further
> assume that "X" imports 50 percent of its
> scrap consumption (paying import duties on
> the same) and obtains the balance locally.
> We can finally assume that "X" sells 50
> percent of its total production for export to
> the United States and 50 percent to Canada.
> Under these imagined circumstances, in
> conjunction with the Korean law, "X" could
> limit its claims for drawback solely to
> shipments to the United States while claiming
> nothing on shipments to Canada – with U.S.
> antidumping motivations in mind.

Pl.'s Mem. 44-45.  Thus, plaintiff insists that a required

shipment-wide allocation of drawback would eliminate the

distortion of dumping margins and maintain the integrity of the

antidumping statute.

The court finds that Commerce's two-prong test is a

reasonable interpretation of 19 U.S.C. § 1677a(c)(1)(B) and that

it properly applied the test to the Korean respondents in this

case.  As noted, pursuant to 19 U.S.C. § 1677a(c)(1)(B), there

are two requirements for adjusting upward CEP based on rebated

import duties.  First, there must be "import duties imposed by

the country of exportation . . . ."  19 U.S.C. § 1677a(c)(1)(B).

Second, those duties must either be rebated or not collected by

the exporting country "by reason of the exportation of the

subject merchandise to the United States."  *Id.*  As this Court

has held previously, nothing in the statute requires an exporter to demonstrate that it allocated its rebated or non-collected duties across the totality of its subject shipments.  *See Far East Mach. Co.*, 12 CIT at 979, 699 F. Supp. at 315 (finding that Commerce's "approach is not an unfair way of proceeding," and that the "method seems reasonably calculated to arrive at a proper adjustment to price"); *Avesta Sheffield, Inc. v. United States*, 17 CIT 1212, 1216, 838 F. Supp. 608, 612 (1993) ("As a matter of policy in drawback cases, [Commerce] does not require exporters to account for a sufficient amount of imported product to cover all products sold to third countries, as well as to the United States.").  Thus, the statute and the two-prong test put the emphasis on proof of a direct link between the rebate of the import duty and on evidence of sufficient imports to account for the duty drawback and the exports of subject merchandise.  The court, therefore, agrees with defendant that "[t]here is no legal basis for the argument that Commerce should not make a duty drawback adjustment unless it can allocate the total pool of duty drawback on a proportional basis among all countries to which respondents export the subject merchandise."  Def.'s Resp. 24;[18]

_____

[18]    The court notes that Commerce has sought public comment on the two-prong test.  *See* Duty Drawback Practice in Antidumping Proceedings, 70 Fed. Reg. 37,764 (Dep't of Commerce June 30, 2005) (request for comments).  Plaintiff claims that "[i]f Commerce's practice might very well change, Mittal should get the benefit now, not just in future reviews."  Pl.'s Mem. 48.  As
                                                      (continued...)

*see also Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001) ("[S]tatutory interpretations articulated by Commerce during its antidumping proceedings are entitled to deference under *Chevron*.").

In addition, the court finds that the Department supported with substantial evidence its decision to make an upward adjustment to CEP to account for the drawback respondents received from the Korean government on their imports of raw materials.  Commerce verified that respondents received drawback for their imports of raw materials used to produce the subject merchandise and that the amount of raw materials imported covered the amount of the drawback.  *See* Issues & Decs. Mem. at 13.  In other words, the Department reasonably concluded that respondents satisfied the two-prong test and, thus, were entitled to the CEP adjustment.

Based on the foregoing, the court sustains as supported by substantial evidence and otherwise in accordance with law Commerce's duty drawback adjustment to respondents' U.S. price of CORE.

---

[18](...continued)
yet, however, Commerce has not altered its treatment of duty drawback adjustments.  Thus, "Commerce's potential rulemaking has no effect here." *Rhone-Poulenc, Inc. v. United States*, 20 CIT 573, 584 n.5, 927 F. Supp. 451, 461 n.5 (1996).

V.    Section 201 Safeguard Duties

Plaintiff next insists that Commerce erred by declining to deduct from CEP certain duties imposed on imports of steel into the United States pursuant to Section 201 of the Trade Act of 1974, 19 U.S.C. § 2251 ("Section 201 Duties").

In the Final Results, Commerce determined that the Section 201 Duties were not deductible from CEP under 19 U.S.C. § 1677a(c)(2)(A).  Pursuant to that provision, when calculating dumping margins, Commerce reduces U.S. price by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, *and United States import duties*, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States . . . ."  19 U.S.C. § 1677a(c)(2)(A) (emphasis added).  Based on its interpretation of the phrase "United States import duties," Commerce customarily deducts from CEP "normal customs duties"[19] but does not deduct either unfair trade duties or Section 201 Duties.

With respect to Section 201, that provision "permit[s] the President of the United States to impose safeguard measures in

---

[19]    Commerce apparently understands the phrase "normal customs duties" to include, *inter alia*, import duties as set out in the Harmonized Tariff Schedule of the United States and the Harbor Maintenance Tax.  In other words, Commerce deducts from CEP those permanent, generally applicable duties fixed at the time of importation.

reaction to threats posed to domestic industry by identified imported items." *Wheatland Tube Co.*, 30 CIT at __, 414 F. Supp. 2d at 1272 n.1.  For example, the President "may, for purposes of taking action under [19 U.S.C. § 2253(a)(1)] . . . proclaim an increase in, or the imposition of, any duty on the imported article . . . ."  19 U.S.C. § 2253(a)(3).  The President may take action, however, only "[i]f the United States International Trade Commission [("ITC" or "Commission")] determines under [19 U.S.C. § 2252(b)] that an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry . . . ."  19 U.S.C. § 2251(a).  Thus, the President may not act unilaterally to increase duties on imports.  Rather, there must first be an affirmative serious injury, or threat of serious injury finding from the ITC.

At issue here is the 2002 Presidential Proclamation that imposed duties to counteract a surge in steel imports.  On December 19, 2001, pursuant to 19 U.S.C. § 2252, the Commission submitted to the President its affirmative determination that certain steel products were "being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or threat of serious injury, to the domestic industries producing like or directly competitive articles." Presidential Proclamation 7529 To Facilitate Positive Adjustment

to Competition From Imports of Certain Steel Products

("Proclamation 7529"), 67 Fed. Reg. 10,553 (Mar. 5, 2002).  As a

result, on March 5, 2002, the President, pursuant to 19 U.S.C.

§ 2253(a)(3)(A), imposed a duty of 15 percent *ad valorem* on,

among other things, imports into the United States of cold-rolled

steel "for a period of 3 years plus 1 day . . . ."  Proclamation

7529, 67 Fed. Reg. at 10,555.  This Section 201 Duty applied to

the CORE imports into the United States that were the subject of

the instant review.  Upon entering their merchandise, respondents

paid to U.S. Customs and Border Protection ("Customs") the

Section 201 Duty.  There is no dispute over the amount of the

duty charged, nor is there any complaint that respondents failed

to pay the duty owed.

Here, as in the past, the Department concluded it would not

deduct Section 201 Duties from CEP

> because 201 duties are not "United States
> import duties" within the meaning of the
> statute, and to make such a deduction
> effectively would collect the 201 duties a
> second time.  Our examination of the
> safeguard[] and antidumping statutes, and
> their legislative histories indicates that
> Congress plainly considered the two remedies
> to be complementary and, to some extent,
> interchangeable.  Accordingly, to the extent
> that 201 duties may reduce dumping margins,
> this is not a distortion of any margin to be
> eliminated, but a legitimate reduction in the
> level of dumping.

Issues & Decs. Mem. at 15.

Mittal insists that Commerce acted unreasonably in not deducting the Section 201 Duties from U.S. price.  Plaintiff's principal argument is that Section 201 Duties are closer to being normal customs duties than they are to antidumping duties and thus constitute "United States import duties," which must be deducted from CEP.  *See* Pl.'s First Supplemental Br. 3.  While plaintiff does not dispute Commerce's practice of not deducting antidumping and countervailing duties from U.S. price under 19 U.S.C. § 1677a(c)(2)(A), it maintains that Section 201 Duties are not of the same nature as those duties.  In plaintiff's view, Section 201 Duties are more akin to normal customs duties because they share a common purpose, i.e., "both types of duties are protective in nature."  Pl.'s Supplemental Br. 3.

Since the completion of briefing in this case, the Federal Circuit has considered the appeal of this Court's decision in *Wheatland Tube Co.*, which held that Section 201 Duties must be deducted from United States price when calculating a respondent's dumping margin under 19 U.S.C. § 1677a(c)(2)(A).  *Wheatland Tube Co.*, 30 CIT at __, 414 F. Supp. 2d at 1285-86.  In reversing *Wheatland Tube Co.*, the Federal Circuit made two related findings.  First, it found that the Department's "interpretation that 'United States import duties' do not include § 201 safeguard duties was the result of its formal notice-and-comment rulemaking process," and thus that Commerce's interpretation "is entitled to

deference as required by . . . [*Chevron U.S.A. Inc. v. Natural

Resources Defense Council, Inc.*, 467 U.S. 837 (1984)] if its

interpretation is reasonable."  *Wheatland Tube Co. v. United

States*, Nos. 2006-1524, 2006-1525, 2007 WL 2119824, at *4 (Fed.

Cir. July 25, 2007).  Second, it concluded that,

> [i]n light of the legislative history of the
> Antidumping Duty Act of 1921, the
> similarities between antidumping duties and
> § 201 safeguard duties, and the likelihood
> that deducting § 201 safeguard duties from
> the [United States price] would result in
> collecting a double remedy, we hold that
> Commerce's interpretation that "United States
> import duties" does not include § 201
> safeguard duties for the purposes of
> determining the [United States price] and
> calculating the dumping margin is reasonable.

*Wheatland Tube Co.*, 2007 WL 2119824, at *7.  Thus, based on the

Federal Circuit's holding in *Wheatland Tube Co.*, the court

sustains as reasonable Commerce's interpretation of "United

States import duties" to exclude Section 201 Duties and its

decision to not deduct those duties from United States price.


CONCLUSION

   Based on the foregoing, the court sustains Commerce's Final

Results.  Judgment shall be entered accordingly.


                                    /s/ Richard K. Eaton
                                       Richard K. Eaton

Dated:    August 1, 2007
          New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

```
                                   :
MITTAL STEEL USA, INC.             :
(formerly INTERNATIONAL            :
STEEL GROUP, INC.),                :
                                   :
        Plaintiff,                 :
                                   :
    v.                             :
                                   :
UNITED STATES,                     : Before: Richard K. Eaton, Judge
                                   :
        Defendant,                 : Consol. Court No. 05-00308
                                   : Public Version
    and                            :
                                   :
UNION STEEL MANUFACTURING          :
CO., LTD.; DONGBU STEEL CO.,       :
LTD.; POSCO; and HYUNDAI           :
HYSCO CO., LTD.,                   :
                                   :
        Deft.-Ints.                :
                                   :
```

<u>JUDGMENT</u>

This case having been submitted for decision and the Court,
after deliberation, having rendered a decision therein; now, in
conformity with that decision, it is hereby

ORDERED that the United States Department of Commerce's
final results of the tenth administrative review of the
antidumping duty order applicable to imports into the United
States of CORE from the Republic of Korea are sustained; and it
is further

ORDERED that this case is dismissed.

/s/ Richard K. Eaton
Richard K. Eaton

Dated:    August 1, 2007
          New York, New York

<u>ERRATUM</u>

*Mittal Steel USA, Inc. (formerly International Steel Group, Inc.)*
*v. United States*, Consol. Court No. 05-00308, Slip Op. 07-117,
dated August 1, 2007.

Page 1:     The name "Julie C. Mendoza" is added after the name
            "Brady W. Mills" as counsel for defendant-intervenors
            Union Steel Manufacturing Co., Ltd. and Dongbu Steel
            Co., Ltd.


September 17, 2007